1
2
3
4
5
6
7

8 **UNITED STATES DISTRICT COURT**

9 **EASTERN DISTRICT OF CALIFORNIA**

10

| | | |
|---|---|---|
| 11 | RODNEY LEE MIGLIORE, | ) Case No.: 1:15-cv-00638 – JLT |
| 12 | Plaintiff, | ) ORDER DIRECTING ENTRY OF JUDGMENT IN<br>) FAVOR OF DEFENDANT CAROLYN COLVIN, |
| 13 | v. | ) ACTING COMMISSIONER OF SOCIAL<br>) SECURITY, AND AGAINST PLAINTIFF |
| 14 | CAROLYN W. COLVIN,<br>Acting Commissioner of Social Security, | ) RODNEY LEE MIGLIORE |
| 15 | | ) |
| 16 | Defendant. | ) |

17      Rodney Lee Migliore asserts he is entitled to supplemental security income under

18 Title XVI of the Social Security Act. Plaintiff argues the administrative law judge erred in evaluating

19 the credibility of his subjective complaints. Because the ALJ identified clear and convincing reasons

20 for finding Plaintiff not to be credible, the ALJ's decision is **AFFIRMED**.

21                         **PROCEDURAL HISTORY**

22      Plaintiff filed his application for benefits on September 20, 2011.  (Doc. 9-6 at 2.) The Social

23 Security Administration denied Plaintiff's application at the initial level on April 9, 2012, and upon

24 reconsideration on November 13, 2012.  (Doc. 9-4 at 13, 36.)  After requesting a hearing, Plaintiff

25 testified before an ALJ on October 24, 2013. (Doc. 9-3 at 29.) The ALJ determined Plaintiff was not

26 disabled and issued an order denying benefits on November 13, 2013.  (*Id.* at 24.)  Plaintiff's request

27 for review by the Appeals Council was denied on February 24, 2015.  (*Id.* at 2.) Therefore, the ALJ's

28 determination became the final decision of the Commissioner of Social Security.

**STANDARD OF REVIEW**

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g). The ALJ's determination that the claimant is not disabled must be upheld by the Court if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)). The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

**DISABILITY BENEFITS**

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

**ADMINISTRATIVE DETERMINATION**

The Commissioner established a sequential five-step process for evaluating a claimant's

1   alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f).  The process requires the ALJ to determine

2   whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2)

3   had medically determinable severe impairments (3) that met or equaled one of the listed impairments

4   set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual

5   functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work

6   existing in significant numbers at the state and national level.  *Id.*  The ALJ must consider testimonial

7   and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

8   **A.    Relevant Medical Evidence**

9          On August 15, 2011, Plaintiff was admitted to the trauma unit at Community Regional Medical

10  Center.  (Doc. 9-9 at 6.)  Plaintiff reported he had been "walking along [the tracks] while intoxicated

11  and was hit by a train."  (*Id.* at 13.)  However, there were "some reports" that Plaintiff was "lying on

12  the railroad tracks" (*id.* at 21), and he "initially told EMS responders that he was attempting to commit

13  suicide."  (*Id.* at 16.)  Thus, there was a question of "suicidal ideation" when Plaintiff was admitted to

14  the hospital.  (*Id.* at 13, 43.)  Plaintiff's right wrist was fractured, and his left arm had "a near complete

15  amputation and also left radius ulnar fracture with severe displacement."  (*Id.* at 6, 42.)  The next day,

16  Plaintiff had surgery to complete the amputation of his left arm at the mid-humerus level, irrigation and

17  debridement of his right open ulnar fracture, and of his left upper extremity.  (*Id.* at 8, 95.)  Plaintiff

18  was discharged from the hospital on August 19.  (*Id.*)

19         On September 14, 2011, x-rays of Plaintiff's right wrist showed "deformity of the fourth and

20  fifth metacarpal bones with dorsal apex angulation."  (Doc. 9-9 at 42.)

21         In October 2011, Plaintiff slammed his right hand in a door, which cut off the tip of his third

22  finger.  (Doc. 9-9 at 64.)  X-rays of his hand showed "evidence of a fracture through the mid third

23  middle phalanx" as well as "evidence of soft tissue laceration."  (*Id.* at 68.)

24         At a follow-up appointment on November 4, 2011, Dr. Lawrence Sue observed that Plaintiff's

25  left arm amputation was "[w]ell healed."  (Doc. 9-9 at 72.)  Plaintiff reported he was "still having pain

26  and phantom pains in [his] arm."  (*Id.*)  He also reported he was depressed, and his father "recently

27  died."  (*Id.*)  Three days later, Rose Le, a nurse practitioner, observed that Plaintiff had a "[r]un of bad

28  luck, still positive attitude."  (*Id.* at 76.)  She observed that Plaintiff was able to "slightly flex" the joint

in his finger, but it was "stiff." (*Id.*)  Plaintiff's right wrist was "stable" and he had a good range of motion. (*Id.* at 80.)

Plaintiff continued to report "phantom pain and pain at [the] stump" in December 2011. (Doc. 9-9 at 91.)  He said Vicodin gave him "[n]o relief." (*Id.*)  Dr. Norio Takayama prescribed Visatril and Norco for Plaintiff. (*Id.*)  At a follow-up appointment in January 2012, Plaintiff reported his "pain [was] well controlled with Norco," and expressed "satisfaction with [the] current pain control with Norco." (Doc. 9-10 at 64.)

Dr. Roger Wagner completed a comprehensive internal medicine evaluation on February 25, 2012. (Doc. 9-9 at 95.)  Plaintiff told Dr. Wagner that "he was trying to save a dog" when he was hit by the train, resulting in the amputation of his left arm. (*Id.*)  Plaintiff said he "still ha[d] some neuropathic and phantom arm pain." (*Id.*)  Plaintiff also reported "some slight pain when attempting to grip strongly with the fourth and fifth fingers of the right hand." (*Id.*)  Plaintiff admitted to drinking a "12 pack of beer per day" and "a history of IV drug use." (*Id.* at 96.)  Plaintiff denied current drug use. (*Id.*) Dr. Wagner noted that Plaintiff was able to write, but had "some subjective weakness." (*Id.*) He also observed:

> The claimant was easily able to get up out of a chair in the waiting room, walk at a brisk pace back to the exam room without assistance.  He sat completely comfortably, easily able to get on and off the exam table, easily able to bend over at the waist, take off shoes, put them back on without any difficulty.

(*Id.* at 96-97.)  Dr. Wagner determined Plaintiff had "good grip strength," and his muscle strength was "5/5…including grip strength." (*Id.* at 98.)  Dr. Wagner found Plaintiff had "good dexterity with the right hand with the exception that he [had] some slight difficulty opposing the fourth and fifth finger to the thumb tip." (*Id.*)  Dr. Wagner opined that "given the lack of the left arm," Plaintiff was limited to lifting and carrying "20 pounds occasionally and 10 pounds frequently," "should not climb or balance on ladders or scaffolds," and "should not work at heights or around heavy machinery." (*Id.*)  He also concluded Plaintiff could perform "[m]anipulative activities… frequently with the right arm." (*Id.*)

On March 7, 2012, Plaintiff visited Community Regional Medical Center for a checkup. (Doc. 9-10 at 46.)  Plaintiff reported he had "a lot of pain and neuropathy symptoms" in his left arm, but it was "controlled with medications." (*Id.* at 49.)  Plaintiff stated he "would like to be fitted for a

prosthesis." (*Id.*) Dr. Jennifer Hubbard refilled Plaintiff's prescriptions for pain medication but told Plaintiff she would not do so again. (*Id.*) She explained that further refills would have to be issued by a primary care physician. (*Id.*) Dr. Hubbard gave Plaintiff a "referral for prosthesis and training." (*Id.*)

Dr. W. Wong reviewed the record and completed a physical residual functional capacity assessment on March 13, 2012. (Doc. 9-4 at 8-13.) Dr. Wong opined Plaintiff was able to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for six hours in an eight-hour day, and sit for six hours in an eight-hour day. (Doc. 9-4 at 9.) According to Dr. Wong, Plaintiff had an "unlimited" ability to balance, stoop, kneel, crouch, and crawl; and he could occasionally climb ramps and stairs. (*Id.* at 10.) Dr. Wong concluded that Plaintiff was able to perform light work with limitations due to his left arm amputation. (*Id.* at 11, 13.)

On April 2, 2012, Plaintiff returned to the trauma center, complaining "of 10/10 pain in the left arm/shoulder at the area of the stub." (Doc. 9-10 at 40.) Plaintiff was again informed "[n]o more pain medications [would] be given" and he needed to "obtain a referral for pain management." (*Id.* at 41.)

Dr. Cindy Zia treated Plaintiff for the first time on April 25, 2012, upon the referral from his trauma surgeon "for pain management." (Doc. 9-10 at 75.) Plaintiff complained of having pain "over [the] stump," which he described as "sharp stabbing, numbness, and tingling." (*Id.*) Plaintiff reported he felt "quite depressed," but "denie[d] crying, decreased energy/concentration or appetite change." (*Id.*) He refused a referral to a psychiatrist and Dr. Zia increased the prescription of Zoloft. (*Id.* at 75-76.) Plaintiff admitted he smoked marijuana without a medical recommendation, and Dr. Zia informed him that he would not be given any opiate medication "until [he] obtains [a] marijuana license." (*Id.*)

In June 2012, Dr. Ashkan Imanzahrai diagnosed Plaintiff with "[c]hronic … neuropathic pain." (Doc. 9-10 at 30.) Dr. Imanzahrai noted Plaintiff had a "history of heavy alcohol use in the past" and informed Plaintiff the clinic did not approve of "use [of] marijuana for pain control with or without [a] card." (*Id.*) Plaintiff was informed that patients seeking opioids "must not be under another physician (sic) care or be addicted an[d] currently [a]busing medication." (*Id.*)

In September 2012, Plaintiff visited the clinic for a medication refill, reporting Neurontin "helps." (Doc. 9-10 at 16, 19.) Plaintiff described his pain as a "5" on a scale of 0-10. (*Id.* at 22.) Plaintiff was reminded that he could not receive opioid medication while using marijuana. (*Id.* at 16,

19.)

Dr. Jackson reviewed the medical record and completed a physical residual functional capacity assessment on November 1, 2012. (Doc. 9-4 at 32-34.) Dr. Jackson opined Plaintiff was able to lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk for six hours in an eight-hour day, and sit for more than six hours in an eight-hour day. (Doc. 9-4 at 32.) Dr. Jackson noted Plaintiff's grip with his right hand was "normal 5/5" and determined he did not have any manipulative limitations with his right hand. (*Id.* at 32-33, emphasis omitted.) Though Plaintiff had "some very minimal difficulty with opposition of the thumb and 4th and 5th fingers," Dr. Jackson believed it "should not be enough to cause the limitations to Frequent Handling and Fingering suggested [by] the CE MSO," Dr. Wagner. (*Id.* at 34.) Dr. Jackson concluded Plaintiff was able to perform light work, with limitations due to his left arm amputation, and affirmed the findings of Dr. Wong. (*Id.*)

On February 20, 2013, Plaintiff reported he had been out of pain medicine for a month. (Doc. 9-10 at 8.) He also said he had not used marijuana for three weeks and "want[ed] strong pain meds." (*Id.*) Plaintiff again reported he was depressed, and his symptoms were "not very well controlled with Zoloft." (*Id.*) As a result, his prescription was changed to Effexor. (*Id.*)

Plaintiff had a follow-up exam in July 2013, during which he requested medication for his phantom pain. (Doc. 9-10 at 85.) He reported that he was "more depressed than in pain." (*Id.*) Upon examination, Plaintiff's strength was "5/5" and his "sensation [was] grossly intact." (*Id.* at 86.) His pain medication was refilled, and Plaintiff received a prescription for trazodone to "help with depression and insomnia." (*Id.* at 87.)

**B.    Administrative Hearing Testimony**

Plaintiff testified at the hearing on October 24, 2013. (Doc. 9-3 at 29.) Plaintiff reported that he attended school through the tenth grade but earned a GED. (*Id.* at 33-34.) He stated he lived with his mother and "work[ed] for HIS taking care of her." (*Id.* at 33.)

He testified he previously worked at Ornamental Iron Supply driving a forklift and loading metal onto trucks. (Doc. 9-3 at 35.) Plaintiff said he had to lift up to "100-125 pounds" while working on that job. (*Id.* at 35-36.) He reported that he also was employed as a painter for 28 years, painting both residential and commercial homes. (*Id.* at 36.)

6

Plaintiff testified he had constant pain where his left forearm was amputated and in his left shoulder. (Doc. 9-3 at 37.) He stated he had sharp pain that "comes and goes" and it lasted for "30 seconds to a minute and a half" at a time. (*Id.*) Plaintiff testified he could not afford a prosthetic and his insurance did not cover the cost. (*Id.*) He reported he also had problems with his right hand, and "getting [his] last two fingers on [his] hand to move sometimes." (*Id.*) Plaintiff said he it was "just hard to grasp things" after he "lost the tip of [his] second finger" when it was slammed in a door. (*Id.*) He stated he could grasp with his right hand, but "it just takes longer." (*Id.*) Plaintiff said he was not trained or given occupational therapy to teach him how to accomplish daily activities with one hand. (*Id.* at 39.)

He reported that he took Naproxen, Tramadol and Neurontin for pain. (Doc. 9-3 at 39.) He stated he also took Baclofen, a muscle relaxer, but did not believed it really worked. (*Id.* at 45.) Plaintiff said the pain medication helped "a little bit, but it just doesn't kill the pain," and he sometimes took "double of what they tell [him] to help ease the pain." (*Id.* at 39.) He reported that doctors recommended additional surgery to deaden the nerves at the end of his stub. (*Id.* at 40.) Plaintiff testified he had "a little problem with [his] back," and experienced pain "every once in a while in the lower back when [he's] done a lot of lifting or bending." (*Id.*) He stated he had not sought treatment for his back pain beyond the pain medication prescribed for his left arm. (*Id.*)

Plaintiff testified his condition made him angry because he was unable to accomplish tasks as quickly as before. (Doc. 9-3 at 46.) Plaintiff testified he took Effexor for depression and Trazodone for insomnia. (*Id.* at 41.) He said Effexor seemed "to help [his depression] a little bit," and he had not received any counseling related to his depression. (*Id.*) Plaintiff reported he could get "so mad and depressed" that he locked himself in his bedroom because he did not "want to be around people" or "talk to anybody." (*Id.*) Plaintiff testified he experienced these feelings "sometimes like four or five days in a row." (*Id.* at 41-42.) However, he stated he does not generally have difficulties getting along with other people, though when in crowds children would stare at him. (*Id.* at 42.)

He acknowledged that he had a history of alcohol and marijuana use. (*Id.*) He stated he was an alcoholic from the age of 16, he "went to a lot of programs," and had been sober for eight months prior to the hearing. (Doc. 9-3 at 42-43.) He stated he smoked marijuana "every once in a while" to help with

his pain.  (*Id.* at 43.)

He said he was able to shower and dress, but it "takes [him] a lot longer." (Doc. 9-3 at 34.)  For example, Plaintiff stated he used to be able to dress in five minutes, and it now takes him 25 to 30 minutes or longer to dress himself.  (*Id.* at 46.)  Plaintiff stated he did household chores, cooked, and used the microwave, but it also took "a little bit longer."  (*Id.* at 34.)  He stated he shopped with his mother and attended church twice a week. (*Id.*) Plaintiff testified that "[d]epending on how [his] arm is feeling," he would decide whether to do housework each day.  (*Id.* at 35.)  Plaintiff stated he watched television, listened to music, and "sometimes" took naps.  (*Id.*)

Plaintiff believed he could probably lift between 15-50 pounds with his right arm.  (Doc. 9-3 at 40-41, 45.)  He stated he was able to hold a pen with his right hand, and his problems with grasping were mainly related to "bigger objects."  (*Id.* at 41.)  He estimated that he could grasp with his right hand for "at least half the day," but if he used his hand for more than four hours, his wrist "start[ed] to hurt right there on the ball where the pins are."  (*Id.* at 44.)  Plaintiff testified that he could lift up to "15-17 pounds" three or four times an hour, and said he could "carry a 50-pound bag of dog food."  (*Id.* at 45.)

Vocational Expert, Judith Najarian, testified after Plaintiff at the hearing.  (Doc. 9-3 at 47.)  She identified Plaintiff's past work—using the *Dictionary of Occupational Titles*[1]—as a material handler, DOT 929.687-030; a painter, DOT 840.381-010; a painter rough, DOT 869.664-014; a home attendant, DOT 354.377-014; and a companion, DOT 309.677-010.  (*Id.* at 47-48.)

The ALJ asked the VE to consider a hypothetical "person of the same age, education, and work background" as Plaintiff.  (Doc. 9-3 at 48.)  In addition, the ALJ stated:

> This person could lift and carry 20 pounds occasionally, 10 pounds frequently, sit, stand, or walk six to eight hours a day, but would have a one-arm restriction, and so we have no manipulation/handling with the left upper extremity which is the non-dominant, and also no climbing ladders, ropes, or scaffolds, or working at heights.

(*Id.*) The VE testified the individual would be unable to perform Plaintiff's past work as a home

---

[1] The *Dictionary of Occupational Titles* ("*DOT*") by the United States Dept. of Labor, Employment & Training Admin., may be relied upon "in evaluating whether the claimant is able to perform work in the national economy." *Terry v. Sullivan*, 903 F.2d 1273, 1276 (9th Cir. 1990).  The *DOT* classifies jobs by their exertional and skill requirements, and may be a primary source of information for the ALJ or Commissioner.  20 C.F.R. § 404.1566(d)(1).

attendant, painter, or material handler, as generally performed.  (*Id.* at 48-49).  She observed Plaintiff

was "obviously" still working as a companion to his mother, but it was "a modified capacity," and he

would not be able to complete the work as normally performed.  (*Id.* at 49.)  However, the VE opined

a person with these limitations could perform other work, such as a surveillance monitor,

*DOT*379.367-010; a proof runner, *DOT*239.677-010; a survey worker, survey taker, *DOT*205.367-054;

and an usher, *DOT*344.677-014.  (Doc. 9-3 at 49-50.)  The VE explained each of these jobs "could be

done one-handed" and the surveillance monitor position was "primarily visual."  (*Id.* at 49.)

Next, the ALJ added a limitation the individual could use "the one-arm… only half a day."

(Doc. 9-3 at 50.)  The VE testified there would be no work available with this limitation.  (*Id.*)

Plaintiff's attorney, Mr. Ishikawa, then added to the first hypothetical, asking the VE to consider

a person who was only able to use his arm for "frequent manipulations."  (Doc. 9-3 at 50-51.) The VE

opined this restriction would not eliminate any of the jobs she identified, unless the person was unable

to "use their stump basically to hold and pass" items.  (*Id.* at 51.)  She believed the surveillance monitor

work could be performed because "the bigger department stores have monitors" and were not operated

using a keyboard or control panel.  (*Id.* at 52-53.)  Rather, the VE explained, the workers were

"basically looking at the screens." (*Id.* at 53.)  According to the VE, a camera could be moved if needed

"but it doesn't take bimanual movement."  (*Id.*)

## C.    The ALJ's Findings

Pursuant to the five-step process, the ALJ determined Plaintiff did not engage in substantial

gainful activity after the application date of August 30, 2011. (Doc. 9-3 at 18.)  At step two, the ALJ

found Plaintiff's severe impairments included: "left arm above elbow amputation status post right

ulnar fracture with ORIF."  (*Id.*) At step three, the ALJ determined Plaintiff did not have an

impairment, or combination of impairments, that met or medically equaled a Listing, including 1.02,

1.05, and 1.07.  (*Id.* at 19.)  Next, the ALJ determined:

> [T]he claimant has the residual functional capacity to lift and/or carry 20 pounds
> occasionally and 10 pounds frequently, and sit, stand, and/or walk 6 to 8 hours in an 8-
> hour work day, but he cannot perform any manipulation or handling with his left upper
> extremity, climb ladders, ropes or scaffolds, or work at heights.

(*Id.*)  Based upon this RFC, the ALJ concluded "the claimant is capable of performing past relevant

1  work as a Companion." (*Id.* at 22.)  In addition, the ALJ concluded "there are other jobs existing in

2  the national economy that he is also able to perform," including surveyance monitor, crew runner,

3  survey taker, and usher. (*Id.* at 22-23.)  Consequently, the ALJ found Plaintiff was not disabled as

4  defined by the Social Security Act. (*Id.* at 24.)

5  <u>**DISCUSSION AND ANALYSIS**</u>

6  Appealing the decision of the ALJ, Plaintiff asserts the ALJ failed to identify clear and

7  convincing reasons for finding Plaintiff's testimony regarding his subjective complaints, including by

8  rejecting the opinion of Dr. Wagner related to Plaintiff's manipulative limitations.  (Doc. 14 at 8-12.)

9  On the other hand, Defendant argues the ALJ properly evaluated Plaintiff's credibility, and the ALJ's

10  decision should be affirmed by the Court. (Doc. 17 at 5-11).

11  **A.      Plaintiff's manipulative limitations**

12  As an initial matter, Plaintiff argues the ALJ erred in the credibility assessment when she

13  rejected the conclusion of Dr. Wagner that Plaintiff "has frequent manipulative limitations of the right

14  hand." (Doc. 14 at 9)  Plaintiff observes, "This was not a limitation that the ALJ assessed in the

15  residual functional capacity determination" and argues the opinion of Dr. Wagner was not properly

16  rejected by the ALJ.  (*See id.*)

17  In this circuit, the courts distinguish the opinions of three categories of physicians: (1) treating

18  physicians; (2) examining physicians, who examine but do not treat the claimant; and (3) non-

19  examining physicians, who neither examine nor treat the claimant.  *Lester v. Chater*, 81 F.3d 821, 830

20  (9th Cir. 1996).  Generally, the opinion of a treating physician is afforded the greatest weight in

21  disability cases, but it is not binding on an ALJ in determining the existence of an impairment or on the

22  ultimate issue of a disability.  *Id.*; *see* 20 C.F.R. § 404.1527(c)(2); *Magallanes v. Bowen*, 881 F.2d 747,

23  751 (9th Cir. 1989).  Further, an examining physician's opinion is given more weight than the opinion

24  of a non-examining physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); 20 C.F.R. §

25  404.1527(c)(2).  Thus, the courts apply a hierarchy to the opinions offered by physicians.

26  A treating physician's opinion is not binding upon the ALJ and may be rejected whether another

27  physician contradicts the opinion.  *Magallanes*, 881 F.2d at 751.  An ALJ may reject an uncontradicted

28  opinion of a treating or examining medical professional only by identifying "clear and convincing"

reasons. *Lester*, 81 F.3d at 831. In contrast, the ALJ may reject a contradicted opinion of a treating or examining professional for "specific and legitimate reasons that are supported by substantial evidence in the record." *Id.*, 81 F.3d at 830. When there is conflicting medical evidence, "it is the ALJ's role to determine credibility and to resolve the conflict." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984). The ALJ's resolution of the conflict must be upheld by the Court when there is "more than one rational interpretation of the evidence." *Id.; see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) ("The trier of fact and not the reviewing court must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ"). Because the opinion of Dr. Wagner was contradicted by Drs. Wong and Jackson, the ALJ was required to set forth specific and legitimate reasons to support the decision.

The ALJ acknowledged that Dr. Wagner opined Plaintiff "may perform manipulative activities frequently with the right arm." (Doc. 9-3 at 21.) However, the ALJ found "no objective findings on physical examinations to corroborate the claimant's alleged problems with grasping." (*Id.*) In addition, the ALJ noted that during the examination, Dr. Wagner determined Plaintiff had "good dexterity and good grip strength with the right hand." (*Id.*) Significantly, the Ninth Circuit determined an ALJ may reject the opinion of a physician when it is inconsistent with his own medical records. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008). In addition, an ALJ may reject reports of physicians that have "little in the way of clinical findings to support [the] conclusion." *Young v. Heckler*, 803 F.2d 963, 968 (9th Cir. 1986). Because Dr. Wagner opined Plaintiff's limitations with his hand were "subjective" (Doc. 9-9 at 96) and the ALJ found the opinion lacked the support of clinical findings, the ALJ was not required to adopt the manipulative limitations.[2]

## B.    Plaintiff's Credibility

In assessing credibility, an ALJ must determine first whether objective medical evidence shows an underlying impairment "which could reasonably be expected to produce the pain or other

---

[2] Moreover, even if Plaintiff was limited to frequent manipulative limitations, the vocational expert testified a person with such a limitation was able to perform work in the national economy, such as a surveillance monitor. (Doc 9-3 at 53.) Thus, any error in not including the limitation in the residual functional capacity assessment is harmless, because it does not negate the ultimate conclusion that Plaintiff is able to perform work in the national economy. *See Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (harmless error exists when it is clear that the ALJ's error was inconsequential to the ultimate non-disability determination) (citations and quotations omitted); *see also Batson v. Comm'r of the Soc. Sec. Admin.*, 359 F.3d 1190, 1197 (9th Cir. 2004) (finding error harmless where it did not negate the validity of the ALJ's ultimate conclusion).

symptoms alleged." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007) (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991)).  Where the objective medical evidence shows an underlying impairment, and there is no affirmative evidence of a claimant's malingering, an "adverse credibility finding must be based on clear and convincing reasons." *Id.* at 1036; *Carmickle v. Comm'r of Soc. Sec. Admin.*, 533 F.3d 1155, 1160 (9th Cir. 2008).  The ALJ determined Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Doc. 9-3 at 21.)  However, the ALJ found Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible . . . ."  (*Id.*)  Consequently, the ALJ was required to set forth clear and convincing reasons for rejecting Plaintiff's testimony regarding his limitations.

Factors that may be considered by an ALJ in assessing a claimant's credibility include, but are not limited to: (1) the claimant's reputation for truthfulness, (2) inconsistencies in testimony or between testimony and conduct, (3) the claimant's daily activities, (4) an unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment, and (5) testimony from physicians concerning the nature, severity, and effect of the symptoms of which the claimant complains.  *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002) (the ALJ may consider a claimant's reputation for truthfulness, inconsistencies between a claimant's testimony and conduct, and a claimant's daily activities when weighing the claimant's credibility).  The ALJ considered a number of factors including conflicts with the medical record, Plaintiff's inconsistent statements, his work history, and his level of activity.  (*See* Doc. 9-3 at 21.)

    1.    Inconsistent statements

Plaintiff asserts the ALJ erred in considering his drug use in the credibility determination. (Doc. 14 at 10.)  A history of substance abuse, without more, may be insufficient to discredit a claimant's testimony.  *See Woodsum v. Astrue*, 711 F. Supp. 2d 1239, 1262 (W.D. Wash 2010) ("discounting plaintiff's credibility because of her substance abuse . . . history was improper, given that it bears little relevance to plaintiff's tendency to tell the truth"); *Johnson v. Barnhart*, 312 F. Supp. 2d 415, 429 (W.D.N.Y. 2003) (holding SSR 96-7p, 1996 SSR LEXIS 4 requires more than "history of alcoholism and drug abuse" to discredit the plaintiff's testimony).  However, the Ninth Circuit upheld an ALJ's

adverse credibility finding where a claimant's testimony and various statements regarding substance abuse were not consistent. *See Thomas,* 278 F.3d at 959; *Verduzco v. Apfel*, 188 F.3d 1087, 1090 (9th Cir. 1999).  For example, in *Thomas*, the ALJ determined the claimant "had not been a reliable historian, presenting conflicting information about her drug and alcohol usage."  *Id.*, 278 F.3d at 959. Ms. Thomas denied using drugs and alcohol to one physician, but later "admitted to alcoholism and to smoking 'a little pot.'"  *Id.*  On another occasion, Ms. Thomas reported "she had not drunk alcohol for 'several months' and 'had not smoked marijuana for about a year."  (*Id.*)  The Ninth Circuit determined the ALJ did not err by inferring "that this lack of candor carries over to her description of physical pain."  (*Id.*)

In this case, the ALJ found Plaintiff made inconsistent statements regarding his use of marijuana by denying that he used drugs to Dr. Wagner but reporting he smoked marijuana to other physicians.  (Doc. 9- 3 at 20.)  In addition, the ALJ noted that Plaintiff gave inconsistent statements regarding whether the medication controlled his pain.  (*Id.* at 21.)  The ALJ observed that Plaintiff "testified that pain medications do not relieve his pain, which is contrary to the medical evidence of record… which indicates that the claimant reported that his pain was well-controlled with medications on multiple occasions."  (*Id.; see also* Doc. 9-3 at 20, citing, *e.g.*, Exh. 5F [Doc. 9-10 at 17, 29, 30, 49, 64-66]).  For example, Plaintiff reported his "pain [was] well controlled with Norco" and expressed "satisfaction with current pain control with Norco."  (Doc. 9-10 at 64).

An ALJ may consider "ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).  Because the ALJ met the burden of identifying inconsistent statements by Plaintiff regarding his use of marijuana and the effectiveness of his medication, this factor supports the adverse credibility determination.

### 2.      Plaintiff's work history

The ALJ opined that Plaintiff's "poor work history" diminished his credibility.  (Doc. 9-3 at 21.)  Plaintiff contends the ALJ should have confronted Plaintiff with the inconsistency between his testimony that he was a painter for 28 years and the fact that "the summary of work earnings do not

1  show a work history of 28 years."  (Doc. 14 at 10-11, citing *Shah v. INS*, 220 F.3d 1062, 1068 (9th

2  Cir. 2000); *Soto-Olarte v. Holder*, 555 F.3d 1089, 1092 (9th Cir. 2009))  According to Plaintiff,

3  because the ALJ failed to confront him about his work history, this is not a "clear and convincing"

4  reason to find he lacks credibility.  (*Id.* at 11).

5          The cases cited by Plaintiff to support his contention are *immigration* matters, rather than

6  Social Security proceedings.  In *Shah*, the Ninth Circuit did not uphold an adverse credibility finding

7  where the significance of a discrepancy was not explained by the immigration judge.  *Id.*, 220 F.3d at

8  1068.  Similarly, in *Soto-Olarte*, the Court found the immigration judge erred by failing to confront

9  the claimant to explain discrepancies between claimant's testimony and the police report.  *Id.* 555 F.3d

10 at 1092.  Plaintiff fails to demonstrate these cases have any bearing on the matter before the Court.

11 Indeed, the proposition that an ALJ must confront claimants in Social Security matters has been

12 rejected by this Court and others throughout the Ninth Circuit.  *See, e.g., Montelongo v. Colvin*, 2014

13 WL 4627245, at *10 (E.D. Cal. Sept. 16, 2014) (rejecting any application of *Soto-Olarte* to the Social

14 Security proceedings because "[a]lthough immigration law is administrative law, it does not apply");

15 *Mulay v. Colvin*, No, 2015 WL 1823261, at *6 (C.D. Cal. Apr. 22, 2015) (rejecting the argument that

16 *Soto-Olarte* applies in adjudicating Social Security actions, because Social Security appeals "are

17 governed by a different statutory and regulatory framework."); *Kocher v. Colvin*, 2015 WL 6956529,

18 at *8 (D. Nev. Sept. 29, 2015) ("The court does not agree that the ALJ was obligated to confront

19 plaintiff. . . . Plaintiff cites no authority for the proposition that the holding of *Soto-Olarte* applies in

20 the Social Security context").

21          Moreover, the Ninth Circuit determined that a claimant's poor work history is a relevant factor

22 in a credibility determination. *Thomas*, 278 F.3d at 959; *Bruton v. Massanari*, 268 F.3d 824, 828 (9th

23 Cir. 2001) (as part of the credibility assessment, the ALJ considered the claimant's work history); *see*

24 *also Drouin v. Sullivan*, 966 F.2d 1255, 1259 (9th Cir. 1992) (finding the ALJ did not err in

25 considering that, "according to [the claimant's] own testimony, she did not lose her past two jobs

26 because of pain").  Consequently, Plaintiff's poor work history was a proper consideration by the ALJ

27 to support the adverse credibility determination.

28 ///

14

3.      Plaintiff's level of activity

A claimant's ability to cook, clean, do laundry and manage finances may be sufficient to support an adverse finding of credibility.  *See Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1175 (9th Cir. 2008); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) (the claimant's activities "suggest she is quite functional.  She is able to care for her own personal needs, cook, clean and shop. She interacts with her nephew and boyfriend.  She is able to manage her own finances...").  Likewise, an ALJ may conclude "the severity of . . . limitations were exaggerated" when a claimant exercises, and participates in community activities.  *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009).

The ALJ noted that Plaintiff testified "he can perform his normal activities of daily living, it just takes longer."  (Doc. 9-3 at 21.)  Plaintiff "said he can dress, shower, cook, shop, attend church twice a week, and even do housework."  (*Id.*)  The ALJ observed that Plaintiff's aunt and a former employer indicated in Third Party Function Reports that Plaintiff "could still perform his activities of daily living with one arm/hand."  (*Id.* at 22.)  Because Plaintiff retained the ability to perform his activities of daily living, his level of activity supports the determination that his impairments were not as disabling as Plaintiff alleged.  *See Stubbs-Danielson,* 539 F.3d at 1175; *Burch*, 400 F.3d at 681.

4.      Objective Medical Record

In general, "conflicts between a [claimant's] testimony of subjective complaints and the objective medical evidence in the record" can constitute "specific and substantial reasons that undermine . . . credibility." *Morgan v. Comm'r of Social Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). The Ninth Circuit explained, "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *see also Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility analysis").  Because the ALJ did not base the decision solely on the fact that the medical record did not support the degree of symptoms alleged by Plaintiff, the objective medical evidence was a relevant factor in determining Plaintiff's credibility.

However, if an ALJ cites the medical evidence as part of a credibility determination, it is not sufficient for the ALJ to simply state that the testimony is contradicted by the record. *Holohan v. Massanari*, 246 F.3d 1195, 1208 (9th Cir. 2001) ("general findings are an insufficient basis to support an adverse credibility determination"). Rather, an ALJ must "specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006); *see also Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993) (an ALJ must identify "what evidence suggests the complaints are not credible").

In this case, the ALJ noted that Plaintiff testified "he ha[d] problems grasping with his right hand." (Doc. 9-3 at 21.) However, the ALJ noted that upon examination, Plaintiff had "good dexterity and good grip strength with his right hand, with only slight difficult opposing the fourth and the fifth finger to his thumb." (*Id*.) Because the ALJ identified inconsistencies between the record and Plaintiff's testimony, the objective medical record supports the adverse credibility determination. *See Greger*, 464 F.3d at 972; *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (an ALJ may consider "contradictions between claimant's testimony and the relevant medical evidence").

## <u>CONCLUSION AND ORDER</u>

As discussed above, the ALJ applied the proper legal standards in evaluating the medical record and Plaintiff's credibility. Therefore, the conclusion that Plaintiff is not disabled as defined by the Social Security Act must be upheld by the Court. *See Sanchez*, 812 F.2d at 510.

Accordingly, **IT IS HEREBY ORDERED**:

1.      The decision of the Commissioner of Social Security is **AFFIRMED**; and

2.      The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Carolyn Colvin, Acting Commissioner of Social Security, and against Plaintiff Rodney Lee Migliore.

IT IS SO ORDERED.

Dated:   **August 26, 2016**                    **/s/ Jennifer L. Thurston**
                                                        UNITED STATES MAGISTRATE JUDGE

16